# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IDRIS ENLOW, | Civil Action No. 11 - 856 |
| Plaintiff, | |
| v. | Chief Magistrate Judge Lisa Pupo Lenihan |
| JEFFREY A. BEARD, CORRECTIONAL OFFICER MR. GRAHAM, CORRECTIONAL OFFICER MR. GRIM, DEPUTY MAHLMEISTER, DEPUTY RUFFO, LIEUTENANT YOCUM, MAJOR SUTTER, MS. BOAL, REGISTER NURSE MICHAEL KILBERT, SCI-MERCER, SUPT. HARLOW, SERGEANT MARSHAL, SERGEANT STORY, SERGEANT WYZA, UNIT COUNSELOR MR. RICKERT, UNIT MANAGER MR. WAGNER, AND DORINA VARNER | ECF No. 96 |
| Defendants. | |

## MEMORANDUM OPINION

Pending before the Court is a Motion for Summary Judgment, which was filed by the Defendants on July 16, 2013. Upon review of the motion, the response in opposition thereto, and the exhibits and the documents in this case, the Court finds that there are no material issues of fact which preclude the issuance of summary judgment. Therefore, the motion will be granted as explained in detail below.

## I. FACTUAL BACKGROUND

Idris Enlow ("Plaintiff") is an inmate in the custody of the Pennsylvania Department of Corrections ("DOC"). He initiated this prisoner civil rights action on June 28, 2011, alleging that Defendants, employees of the DOC at the State Correctional Institution at Mercer ("SCI-Mercer"), violated his rights under the Eighth Amendment and the Americans with Disabilities Act by forcing him to sleep on a top bunk when he had bottom bunk status. As a result, he allegedly fell from the top bunk and sustained serious injuries. The pertinent allegations and facts surrounding the incident are set forth below.

### 1. Plaintiff's allegations

Plaintiff maintains that on or about June 26, 2009, while he was an inmate in the Restrictive Housing Unit ("RHU") at SCI-Mercer, Defendant Story ordered him to move from a cell where he was assigned to a bottom bunk to another cell where he was required to sleep on a top bunk. (Plaintiff's Complaint, ECF No. 11 at p.5). Plaintiff told Defendant Story that he had been assigned bottom bunk status for medical reasons but Defendant Story moved him anyway, allegedly stating that he did not care. Id.

Over the next several days, Plaintiff sent out a series of Inmate Request Slips – including requests to Defendants Mahlmeister, Sutter, Yocum, Wagner, and Rickert on June 30, 2009 – followed by a grievance to Defendant Yocum on July 2, 2009. (Plaintiff's Exhs. A, B, C, D, E, and F, ECF Nos. 105-1 through 105-6). He also verbally advised Defendant Marshal of this issue but Defendant Marshal declined to override Defendant Story's order. (Plaintiff's Exh. I, Deposition of Idris Enlow, ECF No. 105-9 at p.50, lines 22-25; p.51, lines 1-12). On July 5, 2009, Plaintiff fell off his top bunk onto the concrete floor, sustaining what he maintains was serious injuries. (Plaintiff's Exh. I at p.13, lines 17-25; p.14, lines 1-5); (Plaintiff's Complaint,

ECF No. 11 at p.5). He claims that he was in the bed and was "startled" when the nurse came by the cell to administer his medication, calling his name. (Plaintiff's Exh. I at p.13, lines 21-25; p.14, lines 1-5). He "jumped" when he heard his name and fell to the floor. (Plaintiff's Exh. I at p.14, lines 1-5). He maintains that Nurse Palmer, the nurse who was distributing the mediation, witnessed the fall and responded by saying "Oh my God." (Plaintiff's Exh. I at p.17, lines 6-10).

   2. **Fall from top bunk on July 5, 2009**

According to Nurse Palmer's incident report, he looked down to review the Med Book and when he looked up he noted that Plaintiff was on the floor. (Def.'s Exh. 13, Employee Report of Incident 7/5/09 – p.m. Palmer, LPN, ECF No. 99-13). Nurse Palmer called the medical department for additional help and Nurse Kilbert responded almost immediately to the call for medical assistance. (Def.'s Exh. 3, Michael Kilbert Deposition Transcript, ECF No. 99-3 at p.24, lines 22-25; p.25, lines 1-3). When he arrived, Nurse Kilbert saw Plaintiff lying on his stomach with his head toward the bars. (Def.'s Exh. 3 at p.25, lines 7-8). Nurse Palmer told Nurse Kilbert that Plaintiff had fallen but that he didn't see him fall. (Def.'s Exh. 3 at p.25, lines 24-25). Nurse Kilbert went about assessing Plaintiff who was lying face down. (Def.'s Exh. 3 at p.27, lines 1-2). According to Nurse Kilbert, he believed Plaintiff complained that his legs were numb and that he couldn't feel his legs or his arms although Plaintiff was moving his arms while he was talking. (Def.'s Exh. 3 at p.27, lines 1-6). Nurse Kilbert checked Plaintiff's spine area for abnormalities or deformities. (Def.'s Exh. 3 at p.27, lines 4-6). Other than a small cut on his inner lip, no apparent injuries were noted at that time. (Def.'s Exh. 3 at p.27, lines 7-17). Plaintiff was able to move his arms and he had turned his neck to talk to Nurse Kilbert to tell him what was happening. (Def.'s Exh. 3 at p.27, lines 8-11). Nurse Kilbert then helped to stabilize Plaintiff's neck and roll him onto his back. (Def.'s Exh. 3 at p.27, lines 11-12). Nurse Kilbert

also checked Plaintiff's reflexes and noted that he had reflexes in his legs. (Def.'s Exh. 3 at p.30, lines 23-24).

In the range of cells where Plaintiff was located, medical was not able to properly get a stretcher through the doors without turning it on its side or standing it up to get it through the doorways. (Def.'s Exh. 3 at p.30, line 25; p.31, lines 1-4). As such, Plaintiff was rolled onto a bath blanket and drug approximately 50 feet on a smooth concrete floor from his cell to the clearing of the door where Nurse Kilbert had his medical equipment. (Def.'s Exh. 3 at p.31, lines 5-11). Plaintiff was then taken to the infirmary via a stretcher and further examined and evaluated by Nurse Kilbert. (Def.'s Exh. 3 at p.31, line 14-20). There was no doctor in the infirmary at the time but Dr. Baker, the Regional Medical Director, was notified by phone of Plaintiff's fall, condition and physical exam findings. (Def.'s Exh. 3 at p.31, lines 20-25; p.32, line 1). Orders were received to keep Plaintiff in the infirmary overnight for observation. (Def.'s Exh. 3 at p.32, lines 1-2). Plaintiff received the muscle relaxer Roboxin that evening. (Def.'s Exh. 3 at p.31, lines 13-20). He was seen by a medical doctor within 24 hours, evaluated and cleared to return to the RHU with no major injuries. (Def.'s Exh. 3 at p.39, lines 10-12). Plaintiff was also ordered a Velcro belt for back support although Nurse Kilbert had no specific recollection of seeing Plaintiff wearing the belt. (Def.'s Exh. 3 at p.33, lines 4-12).

### 3. Bottom Bunk Physicians' Order

Nurse Kilbert testified that while reviewing Plaintiff's chart he noticed that Plaintiff had a bottom bunk order about a month before the incident occurred, but he did not know if it was in effect at the time of the fall. (Def.'s Exh. 3 at p.36, lines 2-8). According to Nurse Kilbert, Plaintiff would frequently complain about wanting a bottom bunk when he would see Dr. Rueda, the psychiatrist. (Def.'s Exh. 3 at p.21, lines 8-22). He recalls Plaintiff being on and off bottom

4

bunk status frequently per order of Dr. Rueda. (Def.'s Exh. 3 at 8-12). He testified that while the bottom bunk orders that are written by medical usually remain in effect for six months, the orders written by psychiatry usually remain in effect for a month at a time before the need for a bottom bunk is re-evaluated. (Def.'s Exh. 3 at p. 21, lines 20-22). Nurse Kilbert believed that Plaintiff was issued the bottom bunk order because he complained of night terrors and falling out of bed during the night. (Def.'s Exh. 3 at p.22, lines 13-16). He recalls Plaintiff falling out of the bed on multiple occasions, most of which occurred during the day and not at night. (Def.'s Exh. 3 at p.22, line 25; p.23, lines 1-4). Nurse Kilbert testified that he did not believe Plaintiff to have fallen out of bed on July 5, 2009, because the explanation of the fall was not concurrent with the actual physical evidence. (Def's Exh. 3 at p.24, lines 1-7; p.28, lines 2-10). With respect to the incident at issue, Nurse Kilbert recalls Plaintiff stating that he rolled out of bed and fell to the ground. (Def.'s Exh. 3 at p.24, lines 9-10). Nurse Kilbert stated that he was told by Nurse Palmer that he saw Plaintiff with his feet off the bunk like he was about to get off and as he went to the next cell he either heard a fall or heard Plaintiff say that he had fallen. (Def.'s Exh. 3 at p.24, lines 9-16). Nurse Kilbert believed that Plaintiff would have sustained more injuries than just a cut on his lip if the fall occurred in the manner in which Plaintiff described to the medical staff. (Def.'s Exh. 3 at p.28, lines 3-10). Plaintiff purportedly relayed the information regarding his fall to medical at least three to four times that night. (Def.'s Exh. 3 at p.28, lines 11-14).

Within a week or so of the incident, Nurse Kilbert observed Plaintiff doing sit-ups in his cell. (Def.'s Exh. 3 at p.28, lines 21-23). Nurse Kilbert asked Plaintiff about the need for the muscle relaxer that he was being prescribed because he was able to physically do sit-ups and

5

Plaintiff responded by laughing and taking his medication. (Def.'s Exh. 3 at p.28 at lines 24-25; p.29, lines 1-4).

### 4. Notification to Medical regarding bottom bunk status

Nurse Kilbert recalled receiving two to three sick call slips from Plaintiff requesting a renewal of his bottom bunk status the week of the incident. (Def.'s Exh. 3 at p.37, lines 4-6). At that time, Nurse Kilbert was unaware of Plaintiff's bunk status and he did not recall Plaintiff ever asking him to check into why he was being forced to sleep on the top bunk. (Def.'s Exh. 3 at p.37, line 25; p.38, lines 1-5, 18-21). According to Nurse Kilbert, the nursing staff who collects the sick call slips are just the middlemen. (Def.'s Exh. 3 at p.38, lines 16-17). They collect the slips and provide them to the physicians and practitioners whose responsibility it is to check into the request or information on the sick call slip. (Def.'s Exh. 3 at p.37, lines 23-25; p.38, lines 1-8). He recalls most of Plaintiff's request slips being addressed to psychology who handle their own scheduling. (Def.'s Exh. 3 at p.38, lines 10-13).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact. National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific

facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

## III. DISCUSSION

### A. Post-Accident Medical Care

In response to Defendants' Concise Statement of Material Facts, Plaintiff states (and reiterates numerous times) that he is not pursing claims based upon his post-accident medical care and/or the manner in which he was removed from his cell. Therefore, these claims are hereby dismissed at this time.

### B. Personal Involvement of Defendants

Defendants argue that Plaintiff has failed to establish the requisite personal involvement of Defendants Beard, Harlow, Varner, Mahlmeister, Yocum, Wagner, Rickertt, Sutter, Marshal,

Grim, Graham, Wyza, Kilbert, Ruffo and Boal.[1]  Plaintiff has responded stating that he is not pursuing his claims against Defendants Beard, Harlow, Varner, Grim, Graham, Wyza, Kilbert and Boal.  *See* ECF No. 103 at p.2, n.1; p.4, n.4.  Therefore, these Defendants will be dismissed accordingly.  As to the other Defendants, Plaintiff asserts that he has demonstrated the requisite level of personal involvement both directly and in the Defendants' supervisory capacities.

For liability under 42 U.S.C. § 1983, a defendant "must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing Parratt v. Taylor, 451 U.S. 527, 537 n.3 (1981)).  "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode, 845 F.2d at 1207.  However, alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement; allegations "must be made with appropriate particularity." Id.

Defendants maintain that Plaintiff has failed to establish the necessary personal involvement of Defendants Mahlmeister, Wagner, Yocum, Rickertt, Sutter, Marshal and Ruffo. On the other hand, Plaintiff claims that he notified each of these Defendants verbally or by a request slip that he had been placed on a top bunk when he had a documented medical need for a bottom bunk, and that each of these Defendants failed to act to remedy the situation, resulting in his falling and injuring himself.  Thus, Plaintiff claims that each of these Defendants is liable because they had actual knowledge of a serious danger to his health and safety of which they failed to take appropriate steps to remedy.

---

[1] Defendants do not challenge the personal involvement of Defendant Story.  In addition, Plaintiff voluntarily dismissed Defendant Stern from this action on June 27, 2013, (ECF No. 95), and his claims against Defendant Rueda were dismissed with prejudice on May 4, 2012, and July 13, 2012 (ECF Nos. 67, 69).

As best the Court can tell, the only two Defendants Plaintiff verbally spoke with in regard to his bunk situation were Defendants Story and Marshal. With respect to the other Defendants, Plaintiff asserts that he informed them through inmate request slips. Essentially, Plaintiff argues that these inmate request slips are sufficient to establish personal involvement in the alleged violation or create a genuine issue of material fact as to whether Defendants knew about his situation and deliberately failed to act in disregard to his safety. Plaintiff's argument is unpersuasive.

Courts affirm summary judgment where plaintiffs are unable to demonstrate knowledge on the part of a defendant who is alleged to have been deliberately indifferent to a serious medical, health or safety need, like incorrect bunk status. *See*, *e.g.*, Holt v. McBride, No. 13-1084, 2013 U.S. App LEXIS 18480, at *5-6 (10th Cir. 2013) (affirming judgment of district court finding that plaintiff had failed to plead any knowledge on the part of the defendant doctor when inmate was at risk of falling from the top bunk due to medications that induced heavy sleeping because defendant doctor removed lower bunk restriction without ensuring that the inmate plaintiff had mentally and physically adapted to his medications); Cook v. Caruso, No. 11-1454, 2013 FED App. 0697N, 2013 U.S. App. LEXIS 15788, at *15-16 (6th Cir. 2013) (affirming summary judgment in favor of prison officials because the inmate plaintiff, who was epileptic and suffered from grand mal seizures, did not proffer any evidence to show that they ever read the letters plaintiff had sent informing them that the prison had not complied with the notice to put him on a bottom bunk, nor did plaintiff proffer facts to show that they became aware of the facts of his inappropriate bunk placement or that they drew any inferences from those facts). An officer cannot be held liable for failing to alleviate a risky prison condition of which he was not aware. *See* Farmer v. Brennan, 511 U.S. 825, 835 (1994) (to prove an Eighth

Amendment claim regarding prison conditions, plaintiff must show official was aware of facts from which one could infer existence of substantial risk of harm and failed to respond reasonably to that risk).

Applying this standard here, Plaintiff has not shown personal involvement on the part of the Defendants to whom he allegedly sent inmate request slips informing them of the inappropriate bunk transfer. Plaintiff's alternative argument also fails; specifically, that Defendants Mahlmeister, Ruffo, Yocum and Sutter are liable based on a supervisory liability theory because each had actual, personal knowledge of Defendant Story placing Plaintiff on the top bunk despite Plaintiff's bottom bunk status and each held a supervisory position relative to Defendant Story. Once again, Plaintiff's argument assumes that each of these Defendants had knowledge of Plaintiff's bunk transfer, which he has not shown simply through the submission of inmate request slips. *See* Hill v. Fisher, No. 3:10-CV-00459, 2010 U.S. Dist. LEXIS 141855, at *26 (M.D. Pa. Nov. 10, 2010) (stating that submission of a request slip about an incident does not raise a reasonable inference of personal involvement on the part of the defendant to whom the request slip is submitted); *see also* Oliver v. Tennis, No. 4:CV-08-0796, 2008 U.S. Dist. LEXIS 117464, at *28 (M.D. Pa. May 12, 2008) (same). Therefore, Defendants Mahlmeister, Wagner, Yocum, Rickertt, Sutter, and Ruffo are granted summary judgment based on their lack of personal involvement in the alleged violations. Plaintiff has demonstrated personal involvement only on the part of Defendants Story and Marshal.

**C. Eighth Amendment Claim**

Defendants aver that Plaintiff has failed to state an Eighth Amendment claim of deliberate indifference, primarily arguing that as mostly non-medical officials they cannot be liable for any inadequacies in the medical care Plaintiff received. In any event, they note that

Plaintiff, even by his own admission, was provided with prompt medical treatment by medical personnel after his fall and any disagreement as to the adequacy of that treatment does not rise to the level of an Eighth Amendment violation. Plaintiff argues that Defendants have misconstrued his Eighth Amendment claim to be one attacking the quality of medical care he received both before and after his fall; however, he clarifies that his claim against the remaining Defendants is that, despite their actual knowledge of Dr. Rueda's order that he be placed on bottom bunk status, they failed or refused to place him on the bottom bunk.

The Eighth Amendment is judged against settled legal principles, principles which set precise and exacting standards for asserting a constitutional infraction, standards that are governed by the same overarching and animating constitutional benchmarks. As the United States Court of Appeals for the Third Circuit has observed:

> The Eighth Amendment protects against infliction of "cruel and unusual punishment." However, "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Id. (citation and internal quotations omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring control over a tumultuous cellblock." Id.
>
> Resolution of an Eighth Amendment claim therefore "mandate[s] an inquiry into a prison official's state of mind." Wilson v. Seiter, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Two considerations define that inquiry. We must first determine if the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections. Id. at 298, 111 S.Ct. 2321. If not, our inquiry is at an end. However, if the deprivation is sufficiently serious, we must determine if the officials acted with a sufficiently culpable state of mind. Id. In other words, we must determine if they were motivated by a desire to inflict unnecessary and wanton pain. "What is necessary to establish an 'unnecessary and wanton infliction of pain . . .' varies according to the nature of the alleged

constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

Fuentes v. Wagner, 206 F.3d 335, 344-45 (3d Cir. 2000).

While courts recognize that prison officials have an affirmative obligation to protect inmates from known dangers in prison, as is the case generally with Eighth Amendment claims, proof of a culpable subjective intent is a critical component of an Eighth Amendment claim. The leading case in the Third Circuit addressing deliberate indifference in this prison context is found in Beers-Capitol v. Whetzel, 256 F.3d 120 (3d Cir. 2001). In Beer-Capitol, the Third Circuit explained the basic requirements of a claim brought against a prison official under the Eighth Amendment as follows:

> An Eighth Amendment claim against a prison official must meet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind."

Id. at 125 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). Furthermore, in cases involving prison safety or prison conditions, the relevant state of mind "is one of 'deliberate indifference' to inmate health or safety." Id.

This deliberate indifference standard "is a subjective standard under Farmer − the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." Id. Thus, "'[d]eliberate indifference can be shown when a prison official *knows of and disregards* an excessive risk to inmate health or safety' Hamilton v. Leavy, 117 F.3d 742, 747 (3d Cir. 1997) (quotation marks omitted) (emphasis added). Accordingly, "to survive summary judgment on an Eighth Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff is required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants'

12

deliberate indifference to that risk; and (3) causation." Davis v. Williams, 354 F. App'x 603, 605-06 (3d Cir. 2009).

Here, it is disputed whether Defendant Story had actual knowledge of the order in Plaintiff's medical records directing that he be placed on a bottom bunk and deliberately failed to move him in complete disregard to Plaintiff's safety. According to Plaintiff, he informed Defendant Story that he had a bottom bunk order because his medication made him drowsy and because he suffered from night terrors, both of which posed a risk that he would fall off the bed. While Defendant Story could not remember the particulars with regard to Plaintiff's situation, he stated that it was not unusual for an inmate to claim that he had a bottom bunk order whenever he came into the RHU and was moved to a top bunk in a double cell. However, he said that whenever the situation arose, he would, as a matter of course, call medical to confirm whether the inmate's allegation was in fact true, and if so, he would move the inmate to a bottom bunk. He stated that this was his standard procedure, and, while he could not remember specifically speaking with medical, he believed that he did just that when Plaintiff made his complaint.[2]

Despite Plaintiff's assertion to the contrary, these factual disputes are immaterial because what is undisputed in this case is that Plaintiff did not fall out of his bed because of any medical reason necessitating his bottom bunk status. Specifically, Plaintiff stated that he fell out of his bed because he was "startled" when Nurse Palmer called his name during Med Line. Indeed, Plaintiff stated this much in his deposition:

> I was in the bed and the medication man come to the door for medication. The toilet was on the other side of the bed. My head was in the back of the cell, on the bed. That's where the back of the cell - - - the bed was. And he said Enlow. And

---

[2] This is consistent with Defendant Yocum's response to Plaintiff's Grievance dated July 2, 2009, wherein Plaintiff presumably admitted that Defendant Story did speak with medical and was unable to verify his bottom bunk status. (Def.'s Exh. 16, ECF No. 99-16 at pp.22, 37).

> I heard him call my name and I turned around and it startled me and I looked up, and I jumped, because I didn't know what it was that startled me. And I fell and almost hit my head on the toilet, and fell on the floor, the back of the cell.

(Plaintiff's Exh. I, Deposition of Idris Enlow, ECF No. 105-9 at pp.13-14). Additionally, in a letter to Jeffrey Beard, Berry Johnson and Dorina Varner dated August 7, 2009, wherein Plaintiff complained about his fall and the safety conditions at SCI-Mercer, namely that the bunks did not have step ladders, Plaintiff stated that he fell because he "was trying to get down to take [his] medication." (Def.'s Exh. 16, Grievance #279651, ECF No. 99-16 at pp.30, 34). This is consistent with Nurse Kilbert's recollection of what Nurse Palmer had told him regarding the incident; specifically, that he saw Plaintiff with his feet off the bunk like he was trying to get off. (Def.'s Exh. 3 at p.24, lines 9-16). There is simply nothing in the record from which a reasonable jury could conclude that Defendants Story or Marshal, or any Defendant for that matter, was deliberately indifferent to the risk of Plaintiff falling off the bed due to being spooked, startled or intentionally trying to get down. Defendants cannot be held liable for failing to protect Plaintiff from unknown and unforeseeable dangers that were unrelated to his need for a bottom bunk and that presumably caused his injuries; therefore, his Eighth Amendment claim fails. Moreover, even if Plaintiff could demonstrate what he alleges, that Defendants were deliberately indifferent to his medical need for a bottom bunk, Plaintiff's claim would still fail because there is nothing in the record to suggest that he suffered any injury as a result of any deliberate indifference to such medical need. Furthermore, the record reflects that Plaintiff admitted that Defendant Story did, in fact, call medical in an effort to try and determine whether he had a bottom bunk status but that Defendant Story was unable to obtain verification. (Def.'s Ex. 16, ECF No. 99-16 at pp.2, 22, 37). Therefore, it would appear that, even by Plaintiff's own admission, Defendant Story did not act with a sufficiently culpable state of mind when he

refused to move Plaintiff to a bottom bunk. Therefore, Defendants are entitled to summary judgment on this claim.

D. **Americans with Disabilities Act Claim**

Defendants move for summary judgment on Plaintiff's Americans with Disabilities Act ("ADA") claim.[3] To show a violation of Title II of the ADA, a plaintiff must prove that (1) he is a "qualified individual with a disability;" (2) he is being excluded from participation in or being denied the benefits of some "services, programs, or activities," by reason of his disability;[4] and (3) the entity which provides the service, program or activity is a public entity. *See*, *e.g.*, Layton v. Elder, 143 F.3d 469, 472 (8th Cir. 1998); Bowers v. National Collegiate Athletic Ass'n, Act, Inc., 9 F. Supp. 2d 460, 475 (D. N.J. 1998); Adelman v. Dunmire, No. Civ-A. 95-4039, 1997 U.S. Dist. LEXIS 3796, 1997 WL 164240 (E.D. Pa. Mar. 27, 1997), *aff'd*, 149 F.3d 1163 (3d Cir. 1998); Civic Ass'n of

---

[3] In his Complaint, Plaintiff did not specify whether he was seeking relief under Title I or Title II of the ADA. Plaintiff filed his Complaint *pro se* and then later retained counsel. In his response in opposition to the Motion for Summary Judgment, Plaintiff asks the Court treat his ADA claim as a Title II claim.

[4] The ADA, as a remedial statute, must be broadly construed to effectuate its purpose. *See* Helen L., 46 F.3d at 331-33; Niece v. Fitzner, 922 F. Supp. 1208, 1217 (E.D. Mich. 1996); Lincoln CERPAC v. Health and Hosps. Corp., 920 F. Supp. 488, 497 (S.D. N.Y. 1996); Civic Ass'n of the Deaf, 915 F. Supp. at 634. Consistent with this construction, "most courts have given a broad reading to the term 'service.'" Niece, 922 F. Supp. at 1217. *See* Clarkson v. Coughlin, 898 F. Supp. 1019, 1045-47 (S.D. N.Y. 1995) (finding that, pursuant to the ADA, a prison must provide hearing-impaired prisoners with adequate communication devices for telephones and televisions).

In addition to considering this broad construction, the Court must also give considerable weight to the Department of Justice's ("DOJ") regulations. Title II directs the DOJ to promulgate regulations. Substantial weight and considerable deference should be accorded to the DOJ's construction of the statute. Blum, 457 U.S. at 141; Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984); Helen L., 46 F.3d at 331-32. Courts should give the DOJ's regulations controlling weight, unless the regulations are "arbitrary, capricious or manifestly contrary to the statute." Chevron, U.S.A., Inc., 467 U.S. at 844; Helen L., 46 F.3d at 332; Blum v. Bacon, 457 U.S. 132, 141 (1982). These regulations shed light on the meaning and scope of the term "service." The regulations state that the ADA's coverage extends to "all services . . . made available by public entities." 28 C.F.R. § 35.102(a) (1999). According to the Third Circuit, "this broad language is intended to 'apply to *anything* a public entity does.'" Yeskey v. Pennsylvania Dep't of Corrections, 118 F.3d 168, 171 (3d Cir. 1997) (quoting 28 C.F.R. pt. 35, app. A. subpt. A (emphasis added) (brackets in original)).

the Deaf, 915 F. Supp. at 634; Concerned Parents to Save Dreher Park Ctr. v. West Palm Beach, 846 F. Supp. 986, 989-90 (S.D. Fla. 1994).

The Supreme Court has held that Title II of the ADA applies to state prisons and inmates. Penn. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210-12 (1998) (noting the phrase "services, programs, or activities" includes recreational, medical, educational, and vocational prison programs). The proper defendant under a Title II claim is the public entity or an official acting in his official capacity. Therefore, as an initial matter, the individual defendants, sued in their individual capacities, are not liable under Title II of the ADA because they are not "public entities" within the meaning of the ADA. *See* Emerson v. Thiel College, 296 F.3d 184, 189 (3d Cir. 2002). Accordingly, Plaintiff is unable to state a claim against the Defendants in their individual capacities under this act.

To the extent Plaintiff is suing Defendants in their official capacities; the Supreme Court has held that Title II of the ADA "validly abrogates state sovereign immunity" for "conduct that *actually* violates the Fourteenth Amendment." United States v. Georgia, 546 U.S. 151, 159 (2006). However, Plaintiff's claim in this regard fails because he has not shown that he is a qualified individual with a disability within the meaning of the ADA.

It appears as though Plaintiff claims he is disabled because he suffers from night terrors; however, by merely asserting that he has night terrors, Plaintiff's assertion of disability is conclusory. To be considered a "qualified individual with a disability," Plaintiff must demonstrate that he has a "disability" which is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual . . . ." 42 U.S.C. § 12102(1)(A). The Supreme Court has construed the term "substantial" to preclude "impairments that interfere in only a minor way" with a major life activity and the term "major life activities"

to refer "to those activities that are of central importance to daily life." Toyota Motor Mfg. v. Williams, 534 U.S. 184, 196-97 (2002). Therefore, "merely having an impairment does not make one disabled for purposes of the ADA." Id. at 195.

Depending on the circumstances, courts have found summary judgment inappropriate when prison officials have failed to accommodate disabled inmates with bottom bunks. *See* Kiman v. New Hampshire Dep't of Corrs., 451 F.3d 274, 284 (1st Cir. 2006) (summary judgment on ADA claim not proper when inmate with amyotrophic lateral sclerosis and a bottom bunk pass was placed in a top bunk); Patterson v. Kerr County, 2007 U.S. Dist. LEXIS 54745, 2007 WL 2086671 (W.D. Tex. 2007) (denying summary judgment on ADA claim when jail officials did not provide epileptic inmate with a bottom bunk). However, the simple fact that a plaintiff has a doctor's order for bottom bunk status is insufficient to demonstrate a disability within the meaning of the ADA in and of itself. *See* Robertson v. Las Animas County Sheriff's Dep't, 500 F.3d 1185, 1194 (10th Cir. 2007) ("Individuals attempting to prove disability status . . . may not merely rely on evidence of a medical diagnosis of an impairment."). Because Plaintiff has failed to satisfy the first element of his ADA claim, Defendants are entitled to summary judgment.

**E. Retaliation Claim**

Defendants also move for summary judgment on Plaintiff's retaliation claim. In his complaint, Plaintiff alleged that he was placed in a camera cell in retaliation for his complaints and grievances that he filed both before and after his fall from the top bunk. In response, Plaintiff asserts that he is not pursuing a First Amendment retaliation claim. Therefore, any such claim is hereby dismissed. An appropriate Order follows.

Dated: September 23, 2013.

 

                                                                   Lisa Pupo Lenihan
                                                                   Chief United States Magistrate Judge

cc:    Counsel of Record